```
                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                       TAMPA DIVISION
```

RACHELLE JUAREZ,

       Plaintiff,

v.                                   CASE NO:   8:11-cv-1704-T-33MAP

VERIZON SERVICES CORP.,

       Defendant.
_____/

**ORDER**

This cause comes before the Court pursuant to Defendant Verizon Services Corp.'s Motion for Summary Judgment, which was filed June 15, 2012. (Doc. # 11). Plaintiff Rachelle Juarez filed a Response in Opposition thereto on July 13, 2012 (Doc. # 18), and on July 26, 2012, Verizon filed a Reply to Juarez's Response. (Doc. # 25). For the reasons that follow, the Motion is denied.

**I.   Background**

    **A.   Juarez's Promotions and Compensation**

On November 29, 1999, Verizon hired Juarez as a dispatch clerk in Tampa, Florida. (Doc. # 15-8 at 2). Over the next seven years, Juarez transitioned in and out of various roles at Verizon and, on May 15, 2007, Juarez became an Account Manager with the "Verizon Enhanced Communities" West Division. Id. at 1. Juarez received favorable employee evaluations as an Account Manager and, in December 2009, was promoted to

Interim Manager. (Elwell Dep. Doc. # 20 at 35; Juarez Dep. Doc. # 15 at 48). As Interim Manager, Juarez oversaw all West Division regional marketing campaigns and received positive feedback in her performance evaluations.

Specifically, on January 16, 2010, Verizon's National Director of Marketing Services, Dennis Elwell stated that Juarez "performed well in the ... [interim management] role ... exceeded her quota ... and drove top performance from herself and other [Florida account managers]." (Elwell Dep. Exhibit 5 Doc. # 20 at 44). Juarez's April 30, 2010, evaluation likewise stated that Juarez had "strong drive to be at or above 100%," was "successful" and "pushed [her subordinates] to drive higher levels of activities." (Elwell Dep. Exhibit 6 Doc. # 20 at 45-46). On July 24, 2010, Juarez received additional positive feedback that she "adapted very well to the new role, continued to execute strongly, and reached or achieved the requirements of the job." (Elwell Dep. Exhibit 7 Doc. # 20 at 47-48).

During the summer of 2010, Verizon implemented various marketing initiatives, such as waiving credit checks and deposits, to introduce Verizon's new FiOS telecommunications product to the West Division sales market. (Aguayo Decl. Doc. # 12 at ¶ 5). As a result of the marketing initiatives, the

2

West Division's regional sales figures increased and Juarez significantly outperformed her peers. Id.

As Interim Manager, Juarez supervised twelve Account Managers, earned $142,162 in 2010,[1] and oversaw Verizon's marketing efforts for more than 20,000 properties across Florida, California, Texas, Indiana, Oregon, and Washington. (Doc. # 15-8 at 1, 7; Juarez Dep. Doc. # 15 at 51, 53, 55).

After Juarez operated as the West Division's Interim Manager for a period of seven months, Mary Aguayo was hired on July 11, 2010, as the Verizon Enhanced Communities West Area Sales Director. (Aguayo Dep. Doc. # 14 at 5). Aguayo removed Juarez's interim title and enrolled Juarez as the West Division's permanent Regional Marketing Manager on September 19, 2010. (Juarez Dep. Doc. # 15 at 48; Aguayo Decl. Doc. # 12 at ¶ 6). At the time of Juarez's promotion, she received both a base salary and sales incentive bonus. (Doc. # 15-5 at 2).

**B.   Changes at Verizon and Negative Feedback for Juarez**

After Juarez accepted the permanent Regional Marketing Manager position, Verizon's marketing business model began to change. (Aguayo Dep. Doc. # 14 at 68). As part of the shift,

---

[1] According to Alfred DiCarlo, HR Business Partner for Verizon, Juarez's base salary equaled $64,500 in 2010. (Doc. 15-5 at 2). Therefore, Juarez earned $77,662 in incentive based compensation in 2010. Id.

3

Juarez's sales territory was reduced from Florida, California, Texas, Indiana, Oregon, and Washington to limited locations within Florida. Id. at 37-38. According to Aguayo, Juarez was expected to evolve with the shifting business, but Juarez "was resistant and refused" to do so. Id. at 68. Aguayo further testified that "[Juarez] was resistant to [the]... programs that [Verizon] had in place; [specifically, Juarez] was unable to guide a team [concerning business] report accuracy, and also execution of the expectations of the business. Even [after] coaching, mentoring, and training, [Juarez] was resistant to do as she was instructed." Id. at 69-70.

Unsatisfied with Juarez's performance, Aguayo emailed Juarez on October 21, 2010, and October 26, 2010, concerning Juarez's (1) absence during a regional marketing meeting; (2) failure to approve her employees' timecards;(3) inability to attend a department conference call; and (4) improper follow-through on a time sensitive marketing campaign. Id. at 9, 13.

Based on Aguayo's mounting concern that Juarez was unable to meet the needs of the management role, Aguayo requested that Julie Loughridge, former West Division Regional Marketing Manager, visit Verizon's Tampa location to evaluate Juarez in person. Id. at ¶¶ 11-12. Loughridge reported on November 29, 2010, that Juarez lacked objectivity, could not separate

4

personal and professional relationships, and failed to possess the necessary skillset to manage her team. (Doc. # 12-3 at 3-6).

On December 8, 2010, Aguayo documented her concerns with Juarez's performance in a "Counseling Discussion Worksheet" and allegedly shared her feedback with Juarez. (Aguayo Decl. Doc. # 12 at ¶ 14; Doc. # 15-4 at 32). According to Aguayo's comments, both Juarez and her team failed to meet organizational performance standards and failure to show acceptable improvement would result in Juarez's placement on a disciplinary Performance Improvement Plan. (Doc. # 15-4 at 32). Although Aguayo contends that the details of the worksheet were shared with Juarez on December 8, 2010, Juarez does not recall the conversation; Juarez did not countersign the worksheet as evidence that she reviewed the feedback; and the details of the conversation were never recorded in Verizon's ePerformance HR system.[2] (Juarez Dep. Doc. # 15 at 80; DiCarlo Dep. Doc. # 19 at 48-61; Aguayo Decl. Doc. # 12 at ¶ 14).

---

[2] According to printed instructions on the Counseling Discussion Worksheet, the form "should only be used by the manager and/or HR Business Partner for purposes of drafting Counseling Discussion content prior to finalizing it in [Verizon's] ePerformance [Human Resource] System." (Doc. # 15-4 at 32).

5

## C. Juarez's Leave and Aguayo's Reaction

Juarez was absent from work on December 9, 10 and 13, 2010. According to Juarez, she took properly accrued personal days from December 9, 2010, through December 10, 2010, and either took a sick day or bereavement day on December 11, 2010. (Juarez Dep. Doc. # 15 at 83-84). On the afternoon of her return to work on December 14, 2010, Juarez informed Aguayo that she needed to leave early due to a "bad migraine," and would need Wednesday, December 15, 2010, through Friday, December 17, 2010, to mourn the death of her grandmother. (Doc. # 15-4 at 38).

On Tuesday, December 14, 2010, Aguayo met with a Verizon Security investigator to report her suspicion that Juarez violated Verizon's Code of Business Conduct. (Juarez Dep. Doc. # 15 at 126-131; Aguayo Dep. Doc. # 14 at 80). During this discussion, Aguayo contended that Juarez (1) inappropriately calculated mileage for employee expense reimbursement; (2) engaged in inappropriate social relationships with subordinates; (3) disproportionately favored third party contractors; and (4) incorrectly tabulated contractor timesheets and expense reports. Id. The record is not clear as to whether Verizon security was able to substantiate any improper action by Juarez.

6

On Friday, December 17, 2010, Dr. Robert L. Vollbract, MD, endorsed a Family Medical Leave Act Certification Form finding Juarez unable to work from Monday, December 20, 2010, through Thursday, January 10, 2011. (Doc. # 15-4 at 47). On Sunday, December 19, 2010, Juarez emailed Aguayo to inform her that "my bereavement time ended on [December 17, 2010]; however, due to my migraines, my doctor [is] taking me off work [and] I will be on FMLA through [January 6, 2011]." Id. at 45. Aguayo replied on Monday, December 20, 2010, that she was "sorry to hear that Juarez was under the weather" and for Juarez to let her know whether she needed Aguayo's assistance with filing the FMLA application. Id. at 45. The following afternoon, Juarez's physician faxed her FMLA Certification Form to Verizon's Absence Reporting Center. Id. at 46-50.

On Wednesday, January 5, 2011, at 11:19 p.m., Juarez emailed Aguayo to inform her that "the doctor wants me off until Monday, January 10, 2011." (Doc. # 15-4 at 51). Aguayo acknowledged receipt of Juarez's email on Thursday, January 6, 2011. Id. Shortly thereafter, Aguayo requested that Verizon security hire a private investigator to examine whether Juarez was fraudulently filing for FMLA leave. (Aguayo Dep. Doc. # 14 at 74-75; Aguayo Decl. Doc. # 12 at ¶ 16).

On Sunday, January 9, 2011, Aguayo emailed DiCarlo and

7

communicated "upon [Juarez's] return on Monday (Jan 10), unless FMLA extends her again, I will be moving her to a special project.  I will be removing her permanently [from her management role, but] I am awaiting security to finalize their investigation prior to making any announcements to her or the team." (Doc. # 15-5 at 6).  On that same date, Aguayo requested that HR transition Juarez from the West Division Regional Marketing Manager to a "special project" role.

On the evening of January 9, 2011, Aguayo sent an email to Juarez to inform her that the Verizon Enhancement Communities West Division "had quite a bit of change, [and] ... [to] plan on meeting with [Aguayo] early so [they could] catch up on some changes in the business." (Doc. # 15-5 at 6).  On January 10, 2011, Aguayo informed Juarez that she was assigned to a business support position as a "Senior Consultant." Id.  As part of the transition, Juarez lost her management privileges and was no longer eligible for the same level of compensation earned in 2010. (Doc. # 15-6 at 11).  According to an email from DiCarlo, Juarez's new 2011 total compensation package was capped at $75,917. (Doc. # 15-5 at 2).  This downward departure equated to a 46% reduction from Juarez's 2010 take home pay of $142,162. (Doc. # 15-8 at 7).

In the months that followed, three additional Regional

8

Marketing Managers were removed from the Verizon Enhanced Communities program and transitioned into similar business support roles. (Elwell Dep. Doc. # 20 at 112-113). According to Elwell, these transitions were part of a corporate-wide transformation. Id.

Juarez remains employed by Verizon, and on August 1, 2011, she filed a two count Complaint against Verizon alleging (1) FMLA Interference, and (2) FMLA Discrimination pursuant to 29 U.S.C. §§ 2612(a)(1), 2614(a)(1), 2615(a)(1), and 29 C.F.R. § 825.220(c).  Verizon seeks summary judgment as to both counts.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742

(11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference

10

from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

### III. Analysis

The FMLA provides that an eligible employee is authorized to take up to twelve weeks of unpaid leave per year for a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). If the employee returns to work at the end of the leave period, he or she is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced" or, if the previous position is no longer available, "**to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment**." 29 U.S.C. §

2614(a)(1) (Emphasis added).

To preserve the availability of these rights, and to enforce them, the FMLA provides for two types of claims: interference and retaliation claims. See Russell v. N. Broward Hosp., 346 F.3d 1335, 1340 (11th Cir. 2003)(citing Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206 (11th Cir. 2001)); see 29 U.S.C. § 2615(a)(1)-(2). Juarez asserts both retaliation and interference claims.

**A. FMLA Retaliation Claim**

In a retaliation claim, "an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Strickland, 239 F.3d at 1206 (citing 29 U.S.C. § 2615(a)(1)-(2); 29 C.F.R. § 825.220(c)). A prima facie case of discrimination under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct; (2) the employee suffered an adverse employment action; and (3) there is a causal connection between the two. Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234 (11th Cir. 2010). "This can be shown through either direct or indirect evidence, the latter of which requires the burden-shifting framework" of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Connor v. Sun Trust Bank, 546 F. Supp. 2d 1360, 1372 (N.D. Ga. 2008). Juarez submits that she

has proffered indirect evidence of retaliation.

"Under [the McDonnell Douglas] framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination." Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997). The burden then shifts to the defendant, who must articulate a legitimate and non-retaliatory reason for its action. Id. at 1528. If the defendant satisfies its burden of production, the burden shifts back to the plaintiff, who must then prove that the defendant's reason is a pretext for retaliation. Id.

Here, Defendant does not dispute that Juarez engaged in protected activity when she utilized FMLA leave. Defendant asserts that Juarez cannot meet her prima facie burden because Juarez cannot establish an adverse employment action. In addition, assuming that Juarez can establish an adverse employment action, Defendant asserts that there was no causal relationship between Juarez's protected FMLA leave and Verizon's adverse employment action. The Court will address each argument below.

### 1.  Adverse Employment Action

Verizon asserts that "Plaintiff's interference claim ... fails as she was reinstated to an equivalent position." (Doc. # 11 at 17). Verizon maintains that Juarez, in her new

support position, "performed some of the same duties" as her prior position and that "she continued to work with the same organization." Id. at 18. In addition, Verizon contends that her compensation was "comparable" to her prior position. These arguments are not supported by the record.

Juarez has come forward with evidence to support her contention that, immediately upon her return from protected FMLA leave, her salary was significantly reduced, along with her responsibilities and managerial status within the organization. Aguayo testified that the new position was entirely different from Juarez's former managerial position. (Aguayo Dep. Doc. # 14 at 64). Elwell confirmed during his deposition that Juarez's new position was a "straight salary" position with no opportunities for commissions. (Elwell Dep. Doc. # 20 at 67). Dicarlo confirmed that, in her new position, Juarez did not supervise any other employees. (Dicarlo Dep. Doc. # 19 at 20). Juarez's argument that her new position was not equivalent to her former position have not been rebutted by Verizon. Thus, the Court determines that Juarez has established that she suffered an adverse employment action.

### 2. Causal Connection

To demonstrate a causal connection, an employee must show

that the protected activity and the adverse employment action were not completely unconnected. One way to do so is to show that the decision maker was aware of the protected activity at the time he or she decided to take the adverse employment action and that the protected activity and the adverse employment action were "very close" in temporal proximity. See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). As explained in Brungart v. Bellsouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000), "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."

In the instant case, Aguayo's December 1, 2010, email to Juarez offering to assist her with Juarez's FMLA application as well as Aguayo's January 9, 2011, email to DiCarlo that "upon [Juarez's] return [from FMLA leave], ... [Aguayo] would be permanently removing Juarez as a [Regional Marketing Manager]" confirms both Aguayo's knowledge of Juarez's protected activity as well as the close temporal proximity of the adverse employment action. (Doc. # 15-4 at 45; Doc. # 15-5 at 6; Doc. # 15-6 at 15).

However, Verizon asserts that such causation cannot be

15

established because Verizon intended to demote Juarez regardless of her FMLA leave: "prior to her leave, Verizon management had discussed and contemplated changes to the responsibilities, positions, and assignments within the ... organization to meet the needs of the business. Thus, it cannot be disputed that Plaintiff would have been transferred regardless of whether she requested a leave of absence." (Doc. # 11 at 14). Verizon also argues that Juarez's performance issues justify its decision to demote Juarez.

The Court determines that there is a genuine issue of material fact as to whether Verizon demoted Juarez for a prohibited retaliatory reason--her utilization of FMLA leave, or whether Verizon demoted her based on a non-retaliatory motivation, such as corporate restructure or due to Juarez's performance issues.

Because Verizon's supervisor launched internal investigations against Juarez upon Juarez's requests for leave and because her supervisor demoted her on her first day back from leave, a reasonable juror could determine that a causal connection existed between Juarez's demotion and her protected FMLA activities. On the other hand, a reasonable juror could also credit Verizon's argument that Juarez was selected for the support role prior to, and regardless of, her protected

FMLA leave. Verizon's position is supported by Juarez's documented performance issues as well as by the fact that three other Regional Marketing Managers were also transitioned into business support roles in February and March of 2011. (Elwell Dep. Doc. # 20 at 112-113).

The Court will not invade the province of the jury by making a credibility determination between the conflicting evidence and testimony offered by the parties on the issue of causation. This factual dispute warrants denial of the Motion for Summary Judgment as to Juarez's FMLA retaliation claim.

### B. FMLA Interference Claim

"To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." Strickland, 239 F.3d at 1206-07. "Alternatively, an employee may demonstrate that the employer interfered with the FMLA benefit." Lowery v. Strength, 356 F. App'x 332, 334 (11th Cir. 2009). Interference with the exercise of an employee's rights under the FMLA would include, for example, refusing to authorize FMLA leave or discouraging an employee from using FMLA leave. 29 C.F.R. § 825.220(b). While a retaliation claim requires the plaintiff to show that the employer's actions "were motivated by an impermissible retaliatory or

17

discriminatory animus," the employer's intent is immaterial in an interference claim. Strickland, 239 F.3d at 1207.

In the instant case, Verizon argues that Juarez has not presented any evidence that Verizon denied any of Juarez's FMLA rights. However, Juarez alleges that Verizon interfered with her rights under the FMLA by launching frivolous and unwarranted investigations against her upon her use of FMLA leave and by removing her management responsibilities and incentive-based compensation structure, preventing her from returning to the same or a comparable position after she returned from FMLA leave. The record do so reflect that Verizon did not reinstate Juarez into her lucrative sales position upon her return from leave, but instead demoted her to a support position on the same day that she returned from FMLA leave. That position limited Juarez's responsibilities and reduced Juarez's potential compensation.

A reasonable juror could find that Verizon launched a formal internal investigation against Juarez for taking FMLA protected leave. Such juror could also reasonably determine that Verizon's actions, including demoting Juarez, were designed to discourage Juarez from taking FMLA leave. Thus, the Court finds that Juarez's interference claim survives Verizon's motion for summary judgment.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Verizon's Motion for Summary Judgment (Doc. # 11) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>29th</u> day of August, 2012.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record